UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

JON PERRY,

        Plaintiff,

    v.

                             Case No. 1:20-cv-24

INDIAN HILL EXEMPTED
VILLAGE SCHOOL DISTRICT,

                             JUDGE DOUGLAS R. COLE

        Defendant.

## OPINION AND ORDER

Plaintiff Jon Perry, a former elementary school physical education teacher, claims that Defendant Indian Hill Exempted Village School District violated the Americans with Disabilities Act (ADA), Title VII of the Civil Rights Act of 1964, and corresponding Ohio law when it allegedly terminated him following what Indian Hill claims was a pattern of poor judgment on Perry's part. For the reasons discussed below, the Court **GRANTS** Indian Hill's Motion for Summary Judgment (Doc. 35).

## BACKGROUND

Perry, a 59-year-old bipolar African American man, started teaching physical education in the Indian Hill school district in 1993. (Shupe Report, Doc. 39-2, #629; Pl.'s Resp. in Opp. to Def.'s Mot. for Summ. J., Doc. 42, #958; *see* Perry Dep., Doc. 20, #88). He held that position until he resigned, a decision Perry memorialized in a letter he sent to Indian Hill administrators on October 4, 2018. (Doc. 20, #172; *see* Doc. 20-7).

While Perry concedes he resigned, his Complaint alleges that the resignation resulted from Indian Hill discriminating against Perry based on disability and race. In particular, he says that Indian Hill discriminated by: (1) requiring Perry to submit to a fitness-for-duty examination, (2) failing to permit Perry to return to work following the fitness-for-duty examination, and (3) constructively discharging him. (Compl., Doc. 1, #5). Indian Hill, in its motion for summary judgment, says that Perry cannot create a genuine issue of material fact on any of his claims. (*See generally* Doc. 35).

Before turning to the specific facts underlying the instant dispute, some general background on Perry's time at Indian Hill is in order. The record reveals that, while Perry likely brought "many benefits" to Indian Hill, his tenure was nonetheless checkered with several "problematic" exercises of "professional judgment." (Doc. 20-19, #377). And because that context is relevant in determining whether Perry's claims survive summary judgment, the Court covers it in some detail.

It appears that Indian Hill first raised concerns with certain of Perry's behaviors on March 11, 2011. That day, Perry met with Melissa Stewart, who is now the Assistant Superintendent for Indian Hill Schools. (Stewart Decl., Doc. 34, #456). At the time they met in 2011, Stewart was instead serving as the Principal of Indian Hill Elementary. (*Id.*). At the meeting, which Stewart summarized in a memorandum dated March 16, 2011, (*see id.*; Doc. 34-1, #459–60; Doc. 20-19, #376–77), the two discussed numerous then-recent instances of dubious judgment on Perry's part.

The first concerned a time when Perry gave two fifth-grade students his school entrance card.[1] (Doc. 20-19, #376). According to Stewart's memorandum, the explanation that Perry provided at the March 11 meeting was that he "didn't want students to wait for [him] at the conclusion of PE time when returning from an outdoor area." (*Id.*). The memorandum explains that Perry was not permitted to "give information to a student that is meant to be for teachers only."[2] (*Id.*).

At that same meeting, Perry and Stewart also discussed an incident where Perry reported as missing some medication that he had left on his desk. (*Id.*; *see* Doc. 20, #229). During the meeting, Stewart stressed the importance of following established procedures: under Indian Hill policy, teachers "should never have medication on their desks," because it "could be life threatening" "[i]f a student was to ingest the medication." (Doc. 20-19, #376).

In addition, the two discussed Perry's poor attendance at faculty meetings. (*Id.*). Specifically, Perry missed two such meetings in early 2011, but he resumed regular attendance after Stewart raised the issue with him. (*Id.*). Perry explained that he sometimes felt "uncomfortable" with the "environment or subject matter" of the meetings. (*Id.*). Stewart encouraged Perry to raise any such issues with her prior

---

[1] Some parts of the record suggest that Perry gave out a non-physical entrance *code*. (*See, e.g.*, Doc. 20-19, #376). But it appears that Perry in fact gave out a physical card. (*See* Doc. 20, #181–82). The discrepancy does not affect the Court's analysis in this Opinion and Order.

[2] Admittedly, this phrasing—"give information to"—again seems to suggest a code or something of the sort, rather than a card. But, as just noted, *see* note 1, the difference between the two is not relevant to the Court's analysis.

to faculty meetings so that they could determine ahead of time how best to proceed. (*Id.*).

The meeting further covered three troubling examples of Perry's communications with students. Stewart's memorandum explains that the two discussed (1) a disparaging comment that Perry made to a disabled student regarding the student's "lack of friendship," (2) Perry's offer of additional basketball coaching to students, which would have required them to miss two 45-minute sessions of regular class time per week, and (3) Perry's decision to publicly discuss a fifth-grade student's poor grades.[3] (*Id.* at #376–77).

In closing, Stewart encouraged Perry to exercise better judgment. (Doc. 20-19, #377). And while Stewart recognized that Perry brought "many benefits" to Indian Hill Elementary, she also warned him that further "unsound professional decisions … could result in disciplinary action." (*Id.*).

Some nine months later, Perry's behavioral issues resurfaced. On December 16, 2011, Perry met with Stewart and Mark Ault, Indian Hill's then-Assistant Superintendent, to discuss the "inappropriate and unprofessional [] manner" in which Perry had addressed Stewart in a dispute between the two. (*Id.* at #378). The record does not clearly disclose the entirety of Perry's remarks. But it appears that

---

[3] In his deposition, Perry admits to some, but not all, of this conduct. Specifically, he concedes that he (1) gave students his building entrance card, (Doc. 20, #181–82, 231); (2) left his medication on his desk, (*id.* at #231); and (3) missed faculty meetings (although he explains that he missed the meeting because he was caring for his ailing father), (*id.* at #230–31). He denies making a derogatory comment to a disabled student, does not recall offering to provide extra coaching to students, and seems to concede that he discussed grades with a fifth-grade student, but did not talk about the student's "grades being poor." (*Id.* at #274).

they stemmed from a concern that Stewart raised regarding the way Perry was managing his class on a particular day. (*Id.*). In Stewart's view, Perry had handled an in-class situation in a manner that was "derogatory" and "disrespectful" to students. (*Id.*). In response to Stewart's objections, Perry told Stewart that he would call Stewart's former workplace to "'dig up' dirt" on her. (*Id.* at #379). Stewart "almost felt threatened" by the remark. (*Id.*). And it appears that Perry actually did contact a staff member from Stewart's former workplace. (*Id.*). Perry apologized for the sharp words he exchanged with Stewart. (*Id.*). He acknowledged that Stewart was right that "humiliation and embarrassment are poor classroom management approaches." (*Id.* at #378). Ultimately, Perry, Stewart, and Ault agreed that they were moving forward, and Perry affirmed that he "wo[uldn't] let it happen again." (*Id.* at #379).

But by early 2013, Perry was in hot water once more. On February 13, 2013, Stewart received an email from a parent informing Stewart that Perry had given candy to the parent's daughter and "told her not to mention it to anyone."[4] (Doc. 34, #457; *see* Doc. 34-3). After looking into it further, Stewart informed Ault that Perry apparently gave candy to several students as a reward for their help in the classroom, which violated both the district's "Food Allergy Plan," as well as a district regulation

---

[4] The email made clear that Perry was "a very nice teacher," and that the email was "not intended as an accusation of any kind." (Doc. 34-3, #463–64). But in addition to the incident regarding the candy, the email also notes Perry's "strange" habit of inviting students to "stay in the gym after the rest of the class leaves" so that the students could help "clean up." (*Id.* at #463). The parent also communicated that he was less-than-comfortable with Perry referring to the parent's daughter as "one of his favorite students"—especially since, at the time, she was "by herself with him momentarily when she went back to the gym to retrieve a change of clothes she had forgotten." (*Id.*). Finally, as to the candy incident itself, the parent noted that he was upset because he didn't "like an adult male teacher telling my daughter not to mention something to anyone." (*Id.*).

barring staff members from giving food to students as an incentive or reward. (Doc. 20-19, #382). Perry and Stewart had an "investigatory meeting" at which Perry admitted that he allowed students to take candy from his office as a reward, although he said he was not "physically present when this occurred." (*Id.*). One of the students who took the candy "ha[d] severe life-threatening allergies." (*Id.*). Perry acknowledged that the mistake "endangered a student's life." (*Id.*). Ault recorded all of this in an "official Letter of Reprimand" that he placed in Perry's personnel file. (*Id.* at #383). The letter reiterated that it was "imperative that [Perry] use better judgment when dealing with students" and again warned Perry that "[a]ny further demonstrations of these behaviors or violations of District Policy will lead to further corrective action up to and including termination." (*Id.*).

That led to something of a lull. The record divulges no incidents between 2013 and 2018. Then, on June 28, 2018, a physician diagnosed Perry with bipolar disorder. (Doc. 20, #211; Doc. 20-10, #352).

That brings the Court to the instant matter. Two months after the diagnosis, on August 21, 2018, Perry asked a female fourth-grade student to come to the gym alone with him to do "leg throwdowns." (Doc. 20, #184–85). This involved Perry lying on his back and the student standing over Perry to push his legs down in a repetitive, cyclical fashion. (*See id.* at #187). Perry did not mention the activity to any other student or staff member, although the school's security camera caught the action. (*Id.* at #190; Doc. 42, #961). Perry says that he was not attempting anything untoward. Rather, on his telling, he was merely engaging in some "physical therapy" in an effort

to rehabilitate an injured hamstring. (Doc. 20, #190). He says his invitation to the student—whom he characterized as "totally isolated" when she was "reading a book" during recess—was meant to make the student feel included. (*Id.* at #189–90). The following day, Perry invited the same student, as well as the student's friend, back to the gym for "planking exercises." (*Id.* at #191–93). Again, Perry did not mention to any Indian Hill staff member that he was pulling the two students aside. (*Id.* at #190–91).

A little less than a week later, on August 27, 2018, a parent reached out to Whitney Buell, who had since replaced Stewart as Indian Hill Elementary's Principal. (Ault Decl., Doc. 33, #428). The parent reported that Perry had taken "two female elementary school students in[to] the gym area." (*Id.*). That led to a meeting among Perry, Ault, and Buell, and then another meeting with Ault and Anne Kuhn, a representative from Indian Hill's teacher's union. (*Id.* at #427–28). After the latter meeting—which was the first time Perry communicated his bipolar diagnosis to Indian Hill administrators, (Doc. 20, #101, 103)—Indian Hill placed Perry on administrative leave.[5] (Doc. 33, #427). Pursuant to a provision of Indian Hill's

---

[5] It's not clear when, but Indian Hill also "reported [Perry] to the Disciplinary Department at the Ohio Department of Education." (Def.'s Proposed Undisputed Facts, Doc. 36, #492; *see* Doc. 20, #143). Perry's Ohio teaching license expired in 2021. (*See* Doc. 20, #143; Doc. 20-20, #395). But then, on February 22, 2023, the State Board of Education held a hearing on Perry's application for "a five-year pupil activity permit," (Doc. 20-20, #393), a fact that Perry was apparently unaware of until his April 2024 deposition, (Doc. 20, #242). Thus, Perry "was not present at the hearing, nor was he represented by counsel." (Doc. 20-20, #393). Based largely on the facts recited in this Opinion and Order, the State Board of Education denied Perry's request for a five-year pupil activity permit, revoked his "five-year professional special all grades teaching license," and declared him "permanently ineligible to apply for any license, permit, or certificate issued by the State Board of Education." (*Id.* at #394).

collective bargaining agreement (CBA), Ault also directed Perry to obtain a fitness-for-duty examination from a licensed counselor or therapist. (Doc. 33, #427; *see* Doc. 33-3, #437).

The CBA obligated the Indian Hill School Board to "list [] at least three (3) physicians whom the Board believes are qualified to perform the examination." (Doc. 33-3, #437; *see* Doc. 20, #114). Perry then had "five (5) working days" to select "one physician from the list to conduct the examination at Board expense." (Doc. 33-3, #437). The Board duly provided a list of three physicians it deemed competent to undertake the examination, but ultimately, none of the three doctors were available. (Doc. 20, #114). So Ault recommended Michael Miller, a psychiatrist who had sufficient availability to conduct the examination. (*Id.*).

Perry met with Miller, who produced a report on Perry's fitness to teach at Indian Hill—or perhaps more accurately his lack of fitness. (*See* Miller Report, Doc. 20-6). After laying out the technical details of the various types of psychological testing that Miller employed, (*see id.* at #331–39), Miller detailed several areas of "concern and instability" with Perry, (*id.* at #339). These include, among other things, "[p]roblems with veracity," "[r]epetitive instances of poor judgment," and an inability to "use appropriate boundaries" when interacting with students. (*Id.* at #339–40).

Ultimately, the report concludes that Perry is unfit to teach at Indian Hill.[6] (*Id.* at #342). While the report characterizes Perry as "a gentleman," it asserts that he "lacks a healthy ability to comprehend and learn social mores." (*Id.* at #341). In

---

[6] Margery Shupe, Perry's treating therapist, disagrees with Miller's conclusions, and has prepared her own, more favorable writeup on Perry's mental health. (*See* Doc. 39-2).

Miller's view, Perry is apt to "use very poor judgment in the future." (*Id.*). And while the report notes that it is likely that Perry invited the two fourth-grade students into the gym merely because he deemed it a "reasonable medical intervention," (*id.*), the report also says that Perry's actions are "reminiscent" of those who eventually go on to commit more violent and otherwise troubling acts, (*id.* at #342).

At Perry's deposition in this action, he indicates that he had a negative experience with Miller. According to Perry, Miller's "very first question" was a rather blunt and offensive inquiry into Perry's sexuality. (Doc. 20, #80). Perry also says that Miller indicated that the result of Miller's report would dictate whether Perry would be able to keep his job. (*Id.*). Perry asserts that he "would have walked out" on the meeting, but felt compelled to stay to hang on to his employment. (*Id.* at #164).

Ault received Miller's report on September 24, 2018. (Doc. 33, #429). After reviewing it, he informed Perry and Kuhn (the union representative), and set up a meeting with the two of them at the Indian Hill School Board office. (*Id.*). John Concannon, an attorney who was apparently there on Perry's behalf, also attended the meeting. (*Id.*; Doc. 20, #167).

After Perry reviewed the report, and following some discussion, Perry ended the meeting by apprising Ault of his intent to resign. (Doc. 33, #429; Doc. 20, #167). Perry concedes, though, that nobody at the meeting stated that Perry would be fired if he did not resign. (Doc. 20, #162–63, 166). Perry memorialized his resignation in an October 4, 2018, letter addressed to Kuhn and Ault. (*Id.* at #172; *see* Doc. 20-7). The letter declares Perry's intention to "resign as of February 22, 2019," (Doc. 20-7,

#343)—a date that Indian Hill permitted Perry to select to take advantage of his accumulated sick days, (*see* Doc. 20, #83).

Based on these facts, Perry asserts (1) a disability-discrimination claim under the ADA, (2) a race-discrimination claim under Title VII of the Civil Rights Act of 1964, and (3) disability- and race-discrimination claims under related state law. (Doc. 1, #3). As for the disability claims, Perry asserts that (1) Indian Hill "unlawfully required" him to submit to a fitness-for-duty examination, (2) Indian Hill failed to allow him to return to his job after Miller "erroneously concluded that Mr. Perry could not perform his position," and (3) Indian Hill constructively discharged him. (*Id.* at #5). As for the race discrimination claim, Perry asserts that Indian Hill forced him to resign "based upon alleged conduct, which non-African American employees engaged in on a consistent basis, yet were never forced to undergo an IME or resign." (*Id.*). Indian Hill, in its summary judgment motion, contends that Perry's claims fail for myriad reasons. (*See generally* Doc. 35).

Perry has responded, (Doc. 42), and Indian Hill has replied, (Doc. 47), so the matter is ripe for review.

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to conclusively show no genuine issue of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Lansing Dairy, Inc. v. Espy,* 39 F.3d 1339, 1347 (6th Cir. 1994). Once the

movant meets its burden, the nonmoving party may not rest on its pleadings, but rather must come forward with significant probative evidence to support its claim. *Celotex,* 477 U.S. at 324; *Lansing Dairy,* 39 F.3d at 1347. Whether summary judgment is appropriate depends upon "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)).

This Court does not have the responsibility to sua sponte search the record for evidence creating a genuine issue of material fact. *Betkerur v. Aultman Hosp. Ass'n,* 78 F.3d 1079, 1087 (6th Cir. 1996); *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 404–06 (6th Cir. 1992). That burden instead falls upon the nonmoving party to "set forth specific facts" or evidence in dispute. *Anderson*, 477 U.S. at 250 (quotation omitted). If the nonmoving party fails to make the necessary showing for an element upon which it bears the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

In sum, in light of all the facts as to which Indian Hill shows a lack of dispute, Perry must in turn present some remaining "sufficient disagreement" which would necessitate submitting the matter to a jury. *See Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52). That said, in making that determination, the Court must view the evidence in the light most favorable to the nonmoving party—Perry. *See Matsushita Elec. Indus. Co., Ltd. v.*

11

*Zenith Radio Corp.,* 475 U.S. 574, 587–88 (1986); *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) ("In arriving at a resolution, the court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party.").

## LAW AND ANALYSIS

**A.    Indian Hill is Entitled to Summary Judgment on Perry's ADA Disability-Discrimination and Related State-Law Claims Because Perry Did Not Suffer an Adverse Employment Action.**

Start with Perry's disability discrimination claims under the ADA and related Ohio law. Notably, Ohio's disability-discrimination statute parallels the ADA. *Belasco v. Warrensville Heights City Sch. Dist.*, 634 F. App'x 507, 514 (6th Cir. 2015) (quotation omitted); *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 872 (6th Cir. 2007). So the Court applies the same analysis to Perry's federal and state claims on that front.

The ADA prohibits employers from discriminating against qualified individuals based on a disability. 42 U.S.C § 12112(a). ADA plaintiffs can prove discrimination in one of two ways, direct or indirect. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). Each has its own test. *Id.* A plaintiff pursuing a direct evidence theory must point to evidence that "does not require the fact finder to draw any inferences [to conclude] that the disability was at least a motivating factor" in the employment decision. *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 416 (6th Cir. 2020) (alteration in original) (quoting *Hostettler*, 895 F.3d at 853). Indirect or circumstantial evidence cases, by contrast, rest on evidence that creates an inference

of discrimination. *Hartmann v. Graham Packaging Co., L.P.*, No. 1:19-cv-488, 2022 WL 219385, at *5 (S.D. Ohio Jan. 25, 2022). Here, Perry offers no direct evidence that Indian Hill based its adverse employment action on Perry's bipolar diagnosis, so the Court will apply the indirect-evidence framework.[7]

Indirect evidence cases employ the familiar *McDonnell Douglas* burden-shifting framework at summary judgment. *Hrdlicka v. Gen. Motors, LLC*, 63 F.4th 555, 566 (6th Cir. 2023). Under that framework, Perry first must make out a prima facie case of disability discrimination. *Id.* This requires him to show by a preponderance of the evidence that "(1) [he] has a disability, (2) [he] is otherwise qualified for the position, with or without a reasonable accommodation, (3) [he] suffered an adverse employment decision, (4) [his] employer knew or had reason to know of [his] disability, and (5) [his] position remained open, or [he] was replaced." *Id.* (quotations omitted). Second, if Perry makes the requisite showing, the burden shifts to Indian Hill to provide "a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* at 567 (quotation omitted). This burden is merely one of production, not persuasion, and it involves no credibility assessment. *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 585 (6th Cir. 2009). Finally, if Indian Hill offers a legitimate, non-discriminatory reason for its action, then the burden shifts back to

---

[7] Both parties argue the indirect test in their briefing. (*See* Doc. 35, #484–85; Doc. 42, #973; Doc. 47, #1085–88). But Perry also contends that he has direct evidence of disability discrimination. (*See* Doc. 42, #969–73). He is mistaken. The only supposed evidence to which Perry refers is Indian Hill's requirement that Perry undergo a fitness-for-duty examination. (*See id.* at #970). But as explained below, an objectively justified fitness-for-duty examination—which, in the Court's view, this was—is neither an adverse employment action nor evidence of discrimination, whether direct or indirect.

Perry to show, once again by a preponderance of the evidence, that Indian Hill's stated reason amounts to "pretext designed to mask discrimination." *Hrdlicka*, 63 F.4th at 567 (quotation omitted).

Before diving into that analysis, though, the Court observes, as it has before, the tension that arises in applying a "preponderance of the evidence" standard at summary judgment. *Burress v. Spring Grove Cemetery & Arboretum*, No. 1:18-cv-879, 2020 WL 3036047, at *8–9 (S.D. Ohio June 5, 2020). Evidentiary burdens such as a "preponderance" typically involve weighing competing evidence and undertaking credibility assessments. That is not the usual grist of a summary judgment analysis, which instead asks whether the competing evidence creates a "genuine issue of material fact." Fed. R. Civ. P. 56(a). Yet, the Supreme Court itself has referred to a "preponderance of the evidence" standard in describing the *McDonnell Douglas* test, *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 252–53 (1981) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)), and courts have more or less faithfully repeated that framing since.

That said, it also appears that courts have sought to bridge the gap by understanding "preponderance of the evidence" in this context merely to mean that the plaintiff has created at least a genuine dispute of material fact as to each element of the required showing at a given stage, such as a prima facie case. *See, e.g., Cline v. Cath. Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000) ("On a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry."); *Kubik v.*

*Cent. Mich. Univ. Bd. of Trs.*, 717 F. App'x 577, 581 (6th Cir. 2017). And that is the understanding of "preponderance" that the Court will employ here.

But that leads to an additional incongruity. As the Sixth Circuit has further explained, once a discrimination claim reaches trial, "it is normally inappropriate to instruct the jury on the *McDonnell Douglas* analysis." *Beard v. AAA of Mich.*, 593 F. App'x 447, 453–54 (6th Cir. 2014) (quoting *Brown v. Packaging Corp. of Am.*, 338 F.3d 586, 593 (6th Cir.2003)); *see also, e.g., Kanida v. Gulf Coast Med. Pers. LP*, 363 F.3d 568, 576 (5th Cir. 2004) ("This Court has consistently held that district courts should not frame jury instructions based upon the intricacies of the *McDonnell Douglas* burden shifting analysis."). In other words, it appears that, at the summary judgment stage of an employment discrimination case, the Court's job is to determine whether genuine disputes of material fact exist on issues (i.e., as to each element of the prima facie case) that a jury will never be asked to resolve. Be that as it may, that is the framework that precedent commands, so that is the framework the Court will dutifully apply.

Turning back to Perry's disability claims, they stumble right out of the gate. Indian Hill presses several arguments on this front, but the Court opts to focus on a single, dispositive issue here: whether Indian Hill subjected Perry to an adverse employment action. *See Hrdlicka*, 63 F.4th at 566. Perry offers three possibilities on that front, but the Court concludes that none work.

First, consider Perry's assertion that the fitness-for-duty examination constituted an adverse employment action. (*See* Doc. 1, #5; Doc. 42, #971–73). In some

15

circumstances, an employer imposing this obligation could suffice to make the necessary showing. While the ADA permits fitness-for-duty examinations, it does so only if the examination at issue is "shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A); *see Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 811 (6th Cir. 1999) (citation omitted) ("[A]n employer's discretion to order employees to undergo examinations is hardly unbounded. Post-hiring demands for examinations can only be made where shown to be 'job-related and consistent with business necessity.'"). To meet this rather high bar, an employer must present "significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job." *Sullivan*, 197 F.3d at 811. Behavior that is merely "annoying" or "inefficient" won't cut it; "rather, there must be a genuine reason to doubt whether that employee can 'perform job-related functions.'" *Id.* (quoting 42 U.S.C. § 12112(d)(4)(B)). That said, an employer is within its rights to order a "well-founded" examination that is "restricted to discovering whether the employee can continue to fulfill the essential functions of the job." *Id.* at 811–12 (citation omitted). "[A]berrant behavior" that "affects an employee's job performance" can furnish sufficient justification for an examination, as can "health problems that significantly affect an employee's performance." *Id.* at 812. And if the employer makes the necessary showing, "an examination ordered for valid reasons can neither count as an adverse job action nor prove discrimination." *Pena v. City of Flushing*, 651 F. App'x 415, 422 (6th Cir. 2016) (quoting *Sullivan*, 197 F.3d at 813); *see also James v. Goodyear Tire & Rubber Co.*, 354 F. App'x 246, 249 (6th Cir. 2009) ("A valid [fitness-

16

for-duty] demand cannot constitute an adverse employment action in general discrimination claims.").

Looking at the record here, even in the light most favorable to Perry, the Court concludes that Perry has not created a genuine issue of material fact as to the propriety of Indian Hill requiring him to submit to a fitness-for-duty examination. As detailed above, Perry has accumulated a track record of "aberrant behavior" that "affect[ed] [his] job performance." *Sullivan*, 197 F.3d at 812. This behavior was not merely "annoying" or "inefficient." *Id.* at 811. Rather, as already discussed, it had resulted in several meetings with Indian Hill administrators, a formal letter of reprimand, and several warnings of further sanctions if Perry did not change his behavior.

True, Perry disputes some of the underlying events, at least as Indian Hill describes them. *See* supra note 3. But even putting the incidents that Perry disputes aside, there is still "significant evidence" in the record that "could cause a reasonable person to inquire as to whether [Perry was] … capable of performing his job." *Sullivan*, 197 F.3d at 811. This undisputed evidence includes, for example, the incident regarding the building entrance card, Perry leaving his medication on his desk where students could access it, Perry's conduct before and during his December 2011 spat with Stewart, Perry's decision to give children—including a child with serious allergies—candy in violation of at least two separate Indian Hill policies, and, of course, the two incidents with the fourth-grade students in the gym (which, the record suggests, may not have been isolated incidents, *see* supra note 4).

There is no doubt that this pattern of conduct warranted a fitness-for-duty examination under the ADA. Indeed, "many courts have found a valid business necessity when a school staff member is subjected to a medical exam that is prompted by displays of worrisome behavior at work or emotional volatility." *Grassel v. Dep't of Educ. of N.Y.*, No. 12-cv-1016, 2017 WL 1051115, at *7 (E.D.N.Y. Mar. 20, 2017) (collecting cases); *see also, e.g., Sullivan*, 197 F.3d at 808–13 (holding that plaintiff schoolteacher's prima facie case for disability discrimination failed where defendant school district ordered a fitness-for-duty examination based on the teacher's "disruptive and abusive verbal outbursts," disclosure of confidential student information, poor treatment of school board members, and failure to appear at meetings to discuss these various incidents); *Miller v. Champaign Comm. Unit Sch. Dist.*, 983 F. Supp. 1201, 1206 (C.D. Ill. 1997) ("[A] psychiatric examination is 'job-related and consistent with business necessity' in any case where an elementary school employee exhibits paranoid or agitated behavior that causes the school administration to be concerned about the personal safety of those in contact with the employee."). In sum, the Court concludes that, when legitimate questions arise, a "need to determine a teacher's psychological capacity to properly carry out his duties is a vital business necessity." *Grassel*, 2017 WL 1051115, at *7. And "because [Indian Hill] had a valid reason to demand the [fitness-for-duty examination], it did not perpetrate an adverse employment action under the ADA as a matter of law." *James*, 354 F. App'x at 250 (citing *Sullivan*, 197 F.3d at 813).

Perry alternatively alleges that Indian Hill took an adverse employment action against him when it declined to permit Perry to return to work following Miller's report. (Doc. 1, #5). But while he raises the allegation in his Complaint, his theory on this front gets short shrift in Perry's briefing. Indeed, it's not even clear that Perry's briefing treats it as a distinct theory. (*See* Doc. 42, #972–73 (noting the fitness-for-duty examination and alleged constructive discharge, but not a failure to allow Perry to return to work, as adverse employment actions)). The only thing Perry arguably says on this front in his briefing is that "[Indian Hill] and Dr. Miller sought to prevent [Perry] from returning to his teaching role, based on negative perceptions stemming from his mental health diagnosis, and Dr. Miller's report sealed [Perry's] fate." (*Id.* at #972). To the extent that this sentence is an effort to flesh out the assertion in Perry's Complaint, it is factually unsupported. As the Court established above, Indian Hill was legally permitted to require Perry to submit to the fitness-for-duty examination. And, at the first meeting that Perry attended with Indian Hill personnel following Miller's report, he communicated his intent to resign. (*See* Doc. 20, #167; Doc. 33, #429). Thus, the record is devoid of evidence that Indian Hill somehow "failed" to permit Perry to return to work following the issuance of Miller's report, as Perry signaled he was resigning at the first opportunity that presented itself.

Finally, Perry contends that he was constructively discharged. (*See* Doc. 1, #5; Doc. 42, #974). "[A] plaintiff may use a constructive discharge to satisfy the adverse employment action requirement," *Hurtt v. Int'l Servs.*, 627 F. App'x 414, 420 (6th Cir. 2015), but the bar is high. To prove up a prima facie case, a plaintiff must show that

"(1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person, (2) the employer did so with the intention of forcing the employee to quit, and (3) the employee actually quit." *Savage v. Gee*, 665 F.3d 732, 739 (6th Cir. 2012) (cleaned up) (quotation omitted).

Again, the Court opts to focus on a single, dispositive issue here: Perry cannot create a genuine dispute of material fact as to the first element. That is, nothing in the record suggests that Indian Hill deliberately created intolerable working conditions. True, Perry submits that Indian Hill's "unlawful demand for a mental health examination, coupled with the implied threat of termination without pay, was an intolerable situation that would make any reasonable person believe termination was imminent." (Doc. 42, #974). He also says that Indian Hill constructively discharged him after "Miller's damning, humiliating[] report concluded [Perry] could not work around children or be trusted around them." (*Id.*). Perry further contends that Miller told Perry that Miller's evaluation would "determine whether [Perry] could keep his job or not, and [Perry's] union representative told him he should resign." (*Id.*).

But each contention is meritless. At the risk of undue repetition, the Court starts with the observation that, on these facts, the fitness-for-duty examination was permissible as a matter of law. *See Pena*, 651 F. App'x at 422; *James*, 354 F. App'x at 250; *Sullivan*, 197 F.3d at 813. Accordingly, the examination was neither "unlawful" nor "intolerable." (Doc. 42, #974). As for Perry's assertion that Miller's report was "damning" and "humiliating," the Court notes that it cannot be the case that a

20

negative result in a fitness-for-duty examination perforce amounts to constructive discharge. If that were so, then fitness-for-duty examinations could never serve their legitimate function—determining whether a given employee possesses "the ability … to perform job-related functions." 42 U.S.C. § 12112(d)(4)(B).

Next, crediting Perry's assertion regarding Miller's remark on the significance of the report, Miller's remark was admittedly improper. But it is also not sufficient, in and of itself, to serve as the basis for a constructive discharge claim. The Sixth Circuit employs a seven-factor test for assessing work environments that considers, for example, whether the employee faced "demotion," a "reduction in salary," or "reassignment to menial or degrading work." *Logan v. Denny's, Inc.*, 259 F.3d 558, 569 (6th Cir. 2001) (citation omitted). A defendant must use these factors to demonstrate that his working conditions were "objectively intolerable." *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 815 (6th Cir. 2020). Even on a more favorable set of facts, that is "a tough row to hoe." *Groening v. Glen Lake Cmty. Sch.*, 884 F.3d 626, 630 (6th Cir. 2018). As relevant here, a single remark from Miller, an individual who was not even a permanent feature of Perry's workplace at Indian Hill, does not suffice.

Perry's final assertion—that Kuhn, the Indian Hill union representative, told Perry he should resign—is simply false. The portions of the record that Perry cites to as support for this assertion, (*see* Doc. 42, #964, 974), do not, in fact, support it, (*see* Doc. 20, #163–65, 167; Shupe Dep., Doc. 41, #671–72). Indeed, at his deposition Perry conceded under oath that nobody at the meeting where Perry communicated his

21

intent to resign told him that he should do so. (*See* Doc. 20, #166). As best the Court can tell, the closest the record comes to supporting Perry's assertion is Kuhn's supposed remark that Perry would be "back in two weeks" if he "admit[ted] wrongdoing." (*Id.* at #122). But even looking at this fact in a light most favorable to Perry, it does not support the notion that Kuhn told Perry he should "resign." (Doc. 42, #964, 974). And, while the Court is required to draw all reasonable inferences in Perry's favor, it is not required to adopt for summary judgment purposes a version of the facts that is in clear conflict with the record. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

In sum, each of Perry's candidates for adverse employment action fails as a matter of law. And so his disability-discrimination claims fail as well.

**B. Indian Hill is Entitled to Summary Judgment on Perry's Title VII Race-Discrimination and Related State-Law Claims Because Perry Cannot Identify an Appropriate Comparator.**

Next up are Perry's race-discrimination claims. They, too, fail to pass muster.

Title VII proscribes discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). As above, given that this is an indirect evidence case, the Court employs the *McDonnell Douglas* burden-shifting framework to analyze these claims. To establish a prima

facie case of race discrimination under Title VII, a plaintiff must show that "(1) he is a member of a protected class, (2) he was qualified for the job and performed it satisfactorily, (3) despite his qualifications and performance, he suffered an adverse employment action, and (4) he was replaced by a person outside the protected class or was treated less favorably than a similarly situated person outside of his protected class." *Wingo v. Mich. Bell Tel. Co.*, 815 F. App'x 43, 45 (6th Cir. 2020) (citing *Wheat v. Fifth Third Bank*, 785 F.3d 230, 237 (6th Cir. 2015)). And "[b]ecause federal case law governing Title VII actions is generally applicable to discrimination claims under Ohio law," *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 561 (6th Cir. 2004) (citing *Little Forest Med Ctr. v. Ohio Civil Rights Comm'n*, 575 N.E.2d 1164, 1167 (Ohio 1991)), the Court evaluates Perry's state-law claim under this rubric as well.

Perry, who devotes a mere paragraph to race-discrimination theories in his summary judgment briefing, says by way of his prima facie case that there were other, non-African American employees at Indian Hill who "had more serious, physical altercations with students, but were able to retain their jobs." (Doc. 42, #975). Indian Hill argues that Perry's prima facie case is deficient for myriad reasons. (Doc. 35, #478–82). The Court reaches the same conclusion.

To the extent that Perry is pressing a constructive discharge claim (which is not at all clear based on his briefing), it is meritless for the reasons discussed already. He simply cannot show a workplace environment that rose to the level of constructive discharge, either on race or disability grounds.

But Perry's Complaint also states that he is alleging a race-discrimination claim based on Indian Hill's treatment of non-African American co-workers who were not forced to undergo a fitness-for-duty examination after having engaged in conduct like Perry's. (Doc. 1, #5). One could read Perry's argument on this front as asserting that, even if the fitness-for-duty examination was permissible as an ADA matter, it amounted to race discrimination under Title VII to the extent that Indian Hill did not require other, non-African American employees to complete them.

But even so understood, Perry's race-discrimination claims are moribund. And that's because Perry has not identified an appropriate comparator. Perry's briefing neglects to discuss this issue at all. (*See* Doc. 42, #975). But the Court's own review of the record reveals that Perry likely had three candidates in mind: (1) Connie Murphy, an elementary school library worker who was apparently allowed to work in the Indian Hill School Board office until retirement following an altercation that she had with a student, (Doc. 20, #116–18); (2) Dan Topping, a teacher who supposedly received better treatment than Perry after Topping "grabbed a student and threw a student against a wall," (*id.* at #258–59); and (3) Todd Gries, a part-time art teacher who was supposedly "alone with students," (*id.* at #262)—in his deposition, Perry could not recall any specific misconduct on Gries' part, and Perry was "not positive" but said he was "pretty sure" that Gries was suspended and eventually allowed back to teach, (*id.* at #261).

Take them one at a time, starting with Murphy. All Perry knows about Murphy is that she had an "altercation" with a student (*Id.* at #116). He does not know, for

example, whether she "grabbed a student," merely had a verbal spat with the student, or really anything else about the encounter at all. (*See id.* at #116–17). But details matter. "In order to be considered 'similarly situated' for the purposes of comparison, the employment situation of the comparator must be similar to that of the plaintiff in *all relevant aspects.*" *Romans v. Michigan Dep't of Hum. Servs.*, 668 F.3d 826, 837–38 (6th Cir. 2012) (emphasis added) (quoting *Highfill v. City of Memphis*, 425 F. App'x 470, 474 (6th Cir. 2011)). Here, the record is devoid of any indication that Indian Hill had anything even approaching the longstanding pattern of behavioral issues with Murphy that would make her "similarly situated" to Perry. The same goes for Gries. True, the record suggests that, at some point, Gries was "alone with students," whatever one may make of that. (Doc. 20, #262). But it contains no further information on the nature of these clandestine student interactions. Nor, again, does it disclose whether Indian Hill had longstanding behavioral issues with Gries, as it did with Perry.

The record admittedly contains more information on Topping, but none that is helpful to Perry. A sworn statement from Ault explains that Topping, an Indian Hill teacher, received a formal letter of reprimand following "two significant incidents." (Doc. 33, #430). Consistent with Perry's deposition testimony, (*see* Doc. 20, #258), Ault explains that Topping "physically pushed a student," (Doc. 33, #430). Indian Hill was "contemplating Topping's termination." (*Id.*). But after Topping "retained an attorney who argued that Mr. Topping had the disability of alcoholism," Topping was allowed to complete a rehabilitation program and return to work as a teacher. (*Id.*). Perhaps

most importantly for current purposes, Indian Hill required "Topping [to] undergo a fitness[-]for[-]duty examination[,] and he was found fit for duty" before returning to work. (*Id.*). Topping eventually left Indian Hill when the Ohio Department of Education revoked his teaching license because of accumulated DUIs. (*Id.*).

Looking at these facts in a light most favorable to Perry, Topping is not an appropriate comparator for Perry's prima facie case. To the extent that the pertinent adverse employment action is the fitness-for-duty examination, Indian Hill required Topping to complete one. (*Id.*). So it's not the case that Perry was "treated less favorably" than Topping. *Wingo*, 815 F. App'x at 45 (citation omitted). And, unlike Perry, Topping did not reflexively resign after receiving a copy of his fitness-for-duty report—an action that the Court has already rejected as the basis of a constructive discharge claim.

In sum, then, to the extent that Perry asserts a constructive discharge theory in the context of his race-discrimination claims, it fails for the reasons laid out in connection with Perry's disability-discrimination claims. But even assuming that Perry is also basing his race-discrimination claims on an allegedly discriminatory use of fitness-for-duty examinations, those claims still fail because Perry has not identified an appropriate comparator.

## CONCLUSION

Based on the foregoing, the Court **GRANTS** Indian Hill's Motion for Summary Judgment (Doc. 35). Consistent with that, the Court **DIRECTS** the Clerk to enter judgment for Defendant and to **TERMINATE** this matter on the Court's docket.

**SO ORDERED.**

January 23, 2026

**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**